UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CRIMINAL NO.** |
| | : | |
| v. | : | **VIOLATIONS: 18 U.S.C. §§ 1519, 2,** |
| | : | **1621 (Destroying or Concealing Records** |
| **JAIME GALVEZ a/k/a JIM GALVEZ,** | : | **in a Federal Investigation, Perjury)** |
| | : | |
| Defendant. | : | **UNDER SEAL** |

## INFORMATION

The United States Attorney and the United States Department of Justice, Criminal Division, Fraud Section, charge that at all times material to this Information:

## INTRODUCTION

1. JAIME GALVEZ, a/k/a JIM GALVEZ ("GALVEZ"), was the owner and president of J.G. International Freight Corporation ("J.G. International"), which was a freight forwarding company in the business of packaging and shipping goods overseas.

2. Daniel Curran ("Curran") was the owner of an exporting company called Dankim Trading. From in or about December 2000 through in or about May 2005, Curran acted as "exporter" in loan transactions in which J.G. International served as the freight forwarding company. As part of these transactions, Dankim Trading prepared two commercial invoices for the same shipment with the same invoice number: one commercial invoice accurately stated the dollar value of the goods to be shipped overseas by J.G. International and the second commercial invoice materially and substantially overstated the dollar value of the goods to be shipped overseas by J.G. International. Dankim Trading transmitted both sets of commercial invoices to J.G. International to obtain two different bills of lading: one that matched the accurate commercial invoice and one that matched the false commercial invoice. GALVEZ knew the false commercial invoice transmitted to him by Dankim Trading materially and substantially

overstated the dollar value of the goods to be shipped overseas by J.G. International.

    3.    Edward Chua ("Chua") was the owner of two exporting companies called EMMCO and ECCO. From in or about November 1999 through in or about January 2005, Chua acted as "exporter" in loan transactions in which J.G. International served as the freight forwarding company. As part of these transactions, EMMCO and ECCO prepared two commercial invoices for the same shipment with the same invoice number: one commercial invoice accurately stated the dollar value of the goods to be shipped overseas by J.G. International and the second commercial invoice materially and substantially overstated the dollar value of the goods to be shipped overseas by J.G. International. EMMCO and ECCO transmitted both sets of commercial invoices to J.G. International to obtain two different bills of lading: one that matched the accurate commercial invoice and one that matched the false commercial invoice. GALVEZ knew the false commercial invoice transmitted to him by EMMCO and ECCO materially and substantially overstated the dollar value of the goods to be shipped overseas by J.G. International.

    4.    The Ex-Im Bank was an independent agency of the executive branch of the United States and located in Washington, D.C. It was also the official export credit agency of the United States. The mission of Ex-Im Bank was to assist in the export of United States goods to companies overseas. One of the ways Ex-Im Bank fulfilled this mission was by issuing loan guarantees or insurance to lending banks on behalf of creditworthy foreign companies for the purpose of purchasing United States goods. Once Ex-Im Bank issued a loan guarantee, if the foreign borrower defaulted on its loan repayments to a lending bank, the Ex-Im Bank paid the amount of the outstanding loan to the lending bank. In connection with the issuance of a loan

guarantee or insurance policy, the Ex-Im Bank required that a lending bank obtain certain shipping documentation from the exporter, the person or entity shipping the United States goods on behalf of the foreign borrower.  Specifically, the Ex-Im Bank required that an exporter certify to the lending bank the type, amount, and value of the United States goods that it had shipped and that the goods shipped were made in the United States.  These certifications were typically made in the form of an Export-Import Bank Form of Exporter's Certificate ("Ex-Im Bank Exporter's Certificate"), where the exporter certified that the shipping information provided was true and accurate, and the commercial invoice, where the exporter listed the amount and type of United States goods purchased and shipped and value of those goods.  Without these certifications and commercial invoices, the lending bank would not be able to obtain Ex-Im Bank loan guarantees or insurance.

5. Relying on information contained in fraudulent shipping documents produced to the lending banks by Curran, Chua and others, the Ex-Im Bank provided United States lending banks with approximately $40 million worth of loan guarantees, promising that the Ex-Im Bank would reimburse the lending banks for any losses they incurred in brokering the loan transactions.  As a result of defaults related to the fraudulent loan transactions facilitated by Curran, Chua and others, the Ex-Im Bank has paid out approximately $25 million in claims to the lending banks.

6. On or about April 11, 2006, a grand jury in Washington, D.C. served a grand jury subpoena on the Custodian of Records of J.G. International.  The grand jury was acting in response to and in furtherance of a criminal investigation undertaken by the United States Department of Justice, a department of the United States.  The subpoena demanded that J.G.

International produce certain documents to the grand jury.  Among other things, the subpoena demanded that J.G. International produce "[a]ll bills of lading and shipping documents related to work performed on behalf of" Dankim Trading, Curran, EMMCO, ECCO, and Chua.  The subpoena also demanded that J.G. International produce "all correspondence" between J.G. International, Curran and Chua.

7.      On or about May 11, 2006, at GALVEZ's direction, J.G. International produced documents responsive to the grand jury subpoena.  Prior to producing documents to the grand jury, GALVEZ caused the concealment and destruction of approximately 35 commercial invoices J.G. International received from Dankim Trading, EMMCO, and ECCO that materially and substantially overstated the dollar value of the goods actually shipped overseas by J.G. International for those clients.

### COUNT ONE
### (DESTROYING OR CONCEALING RECORDS IN A FEDERAL INVESTIGATION)

8.      Paragraphs 1 through 7 of this Information are realleged and incorporated by reference as if set out in full.

9.      From in or about April 11, 2006, through on or about May 11, 2006, GALVEZ knowingly altered, destroyed, mutilated, concealed and covered up records, documents and tangible objects, to wit, approximately 35 commercial invoices J.G. International received from Dankim Trading, EMMCO, and ECCO that materially and substantially overstated the dollar value of the goods actually shipped overseas by J.G. International for those clients, with the intent to impede, obstruct and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States.

**(Destroying or Concealing Records in a Federal Investigation, in violation of Title 18, United States Code, Sections 1519 and 2)**

## COUNT TWO
## (PERJURY)

10. Paragraphs 1 through 7 of this Information are realleged and incorporated by reference as if set out in full.

11. On or about June 16, 2006, GALVEZ was served with a subpoena to testify before the grand jury in Washington, D.C.

12. On or about July 6, 2006, in the District of Columbia, GALVEZ, having duly taken an oath before a federal grand jury, during an investigation duly authorized by the grand jury, that he would testify truly, did willfully and knowingly and contrary to said oath state the following material matters that he did not believe to be true as underlined below:

> Q. To your knowledge, until you were first contacted by the government, did you know anything about Dankim using false shipping documents?
>
> A. <u>No. As far as my recollection, no.</u> I had no reason to doubt, you know. Everything was just – until that time that I was contacted, correct.
>
> Q. Prior to when you were contacted by the government, did you have any knowledge that Dankim Trading was producing two different copies of commercial invoices with the same invoice number, but with different descriptions of goods?
>
> A. <u>As far as I recall, no. No.</u>
>
> Q. Okay. You don't recall ever knowing that Dankim would have different commercial invoices for the same transaction?
>
> A. <u>Right</u>.

when in truth and in fact, as the defendant then and there well knew, Dankim Trading had transmitted to J.G. International two different copies of commercial invoices for the same shipment with the same invoice number.

**(Perjury, in violation of Title 18, United States Code, Section 1621)**

                JEFFREY A. TAYLOR
                United States Attorney
                In and For the District of Columbia

By: _____/s/_____
                MICHAEL K. ATKINSON
                D.C. Bar # 430517
                Assistant United States Attorney
                Fraud and Public Corruption Section
                555 4th Street, N.W.
                Washington, D.C. 20530
                (202) 616-3702

                STEVEN A. TYRRELL
                Chief, Fraud Section
                Criminal Division
                United States Department of Justice

By: _____/s/_____
                HANK BOND WALTHER
                D.C. Bar # 477218
                Trial Attorney
                Fraud Section, Criminal Division
                United States Department of Justice
                1400 New York Avenue, NW
                Washington, D.C. 20005
                (202) 257-6176

Dated: September 4, 2007